MORRIS BONEY

*v.*

JOHN H. WILLIAMS et al.

1. An agreement that payments of part of the amount of subscriptions to the capital stock of a corporation shall be secured by mortgage, is void as against the creditors of the corporation, and cannot be the basis for relief on a cross-bill seeking to enforce the agreement.

2. Where a person has loaned money to a mortgagor, and claims an equitable right to share in the security of the mortgage to which he is not a party, he must establish, by the weight of the evidence, that all the persons interested as mortgagors and mortgagees agreed that he also should be secured by the mortgage.

3. This agreement must precede or coincide in point of time with the advancement of the money loaned.  A promise made to the lender, after he has advanced the money, that he may share in the security of the mortgage, is voluntary and without consideration, and cannot be enforced.

On bill to foreclose.

This is a bill to foreclose a mortgage made by the defendant John H. Williams to John J. O'Neil and George H. Becker, to secure the payment of a bond made by Williams to O'Neil and Becker, conditioned for the payment of $35,000 within five years from the date thereof, with interest payable half yearly at the rate of six per cent. per annum. The mortgage was given on a lot of ground and hotel thereon erected, situated in the borough of Sea Isle City, Cape May county, New Jersey. The mortgage is dated September 6th, 1888, and was recorded September 8th, 1888, in the Cape May county clerk's office.

On December 1st, 1892, O'Neil and Becker's administratrix (Becker having in the meanwhile died intestate) assigned the bond and mortgage to the complainant, Morris Boney. Afterwards, on June 29th, 1893, Boney assigned the mortgage to the Sea Isle City Lot and Building Association, No. 3, a corporation of the State of New Jersey. Afterwards, on June 30th, 1893, the Sea Isle City Lot and Building Association, No. 3, assigned the mortgage to the complainant as collateral security for the payment of eight promissory notes, each for the payment of $1,522.50, making in all $12,180. The notes were from time to time renewed, the bond and mortgage still standing as security for their payment, and on the 2d day of July, 1894, they still remained unpaid, and the sum of $12,180 was due on them with interest thereon from the last-named date.

On September 6th, 1888, Williams executed a mortgage on the mortgaged premises to James P. McGuigan, for $8,740, which the complainant admits to be prior to his mortgage, but which he claims has been reduced by payments on account made to McGuigan or to other persons for him.

The complainant also makes defendants certain named judgment creditors, whose rights in the premises have been concluded by a decree in this suit.

The bill further states that the defendant Charles K. Landis recovered a judgment on July 10th, 1893, against the Sea Isle City Hotel Company, in the Cape May circuit court, and issued

thereon an execution, and levied upon the rights of the Sea Isle City Hotel Company in the mortgaged premises, which he caused to be sold, and himself became the purchaser by a deed from the sheriff of the county of Cape May, dated May 16th, 1896; that under this deed Landis claims some lien or estate in the mortgaged premises which the complainant charges is subject to the lien of the complainant's mortgage.

The bill further states that Williams is reputed, to have made a declaration of trust, that he holds the title in trust for the Sea Isle City Hotel Company, and it charges that if he has made any such declaration, it was executed subsequently to the complainant's mortgage, and is subject to its charge and lien. The prayer of the bill is for answer without oath, and for foreclosure and sale of the mortgaged premises.

The defendant Landis is the only contestant in the case. He files an answer admitting the allegations of the bill to be true. He also files his cross-bill alleging that the Sea Isle Lot and Building Association, No. 2, was the owner of the mortgaged premises, and entered into an agreement to sell the same to the Sea Isle City Hotel Company; that the hotel company entered into possession of the premises and built a large hotel thereon at a cost of $60,000, and has continued in possession until the complainant recently entered under his mortgage; that the hotel company, being in need of money, solicited a loan from the defendant Landis, and " upon its promise to secure his repayment by mortgage the same as third syndicate " (a phrase indicating the Sea Isle City Lot and Building Association, No. 3), Landis paid to the Sea Isle City Hotel Company in cash on July 3d, 1888, $1,536.87; July 31st, 1888, $1,505.41; August 27th, 1888, $1,410.30; that this indebtedness was the basis upon which the defendant Landis obtained his judgment at law in the Cape May county circuit court, set forth in the bill, and caused the hotel property in question to be sold, which he purchased at the sheriff's sale as above stated.

The defendant, in his cross-bill, further states that the Sea Isle City Lot and Building Association, No. 2, about September 6th, conveyed its lands to the defendant John H. Williams, and

thereupon executed the mortgage to James P. McGuigan set forth in the bill, in trust for the Sea Isle City Lot and Building Association, No. 2, which mortgage the defendant states was given to secure the price for the purchase of the land by the said Sea Isle City Hotel Company, Williams acting in the transaction as a trustee and having no interest in it whatever; that Williams thereupon executed to Becker and O'Neil the mortgage set forth in the bill of complaint now held by the complainant. The defendant, in his cross-bill, then sets forth his equity as follows:

"The whole consideration of the bond it [the mortgage to Becker and O'Neil] was so given to secure, also mentioned and described in the said bill of complaint, *being the debt of the said Sea Isle City Hotel Company to this defendant for the said moneys loaned by him as aforesaid, and to the said third syndicate for moneys loaned and which they might thereafter loan to the said company,* the said John H. Williams, John J. O'Neil and George H. Becker acting in the transaction as trustees and having no other right or interest therein; that the said complainant and the said Sea Isle City Lot and Building Association, Number Three, at the several times when the said deed of mortgage was assigned, transferred and set over to them respectively as stated in the said bill of complaint, and at all times since the said mortgage was made and executed as aforesaid, each well knew the premises and all the matters and things thereinabove set forth, and accepted the said deed of mortgage by the said assignments, transfers and settings over, and particularly the said complainant, by the said assignment, transfer and setting over of the same by virtue of which he seeks relief in this suit, took, received and *accepted the said deed of mortgage, with full and particular knowledge and notice of the same, of the rights and equities of this defendant, in the said deed of mortgage, and of the trust for this defendant, with which the same was charged* when it came to his hands."

By special replication the complainant, Boney, admits that Mr. Landis made the loans claimed to have been made by him, but it denies that these moneys advanced by Mr. Landis formed any part of the consideration of the mortgage now being foreclosed, and denies that the holders of that mortgage were trustees for Mr. Landis. He further denies that the Sea Isle City Lot and Building Association, No. 3, had any knowledge of Landis' claim, denies that he (Boney) had any knowledge, and denies that Landis ever had any right or equity in the mortgage.

*Mr. Charles K. Landis, Jr.,* for C. K. Landis, the complainant in the cross-bill.

*Mr. J. Willard Morgan* and *Mr. Samuel W. Beldon,* for Morris Boney, the defendant in the cross-bill.

Grey, V. C.

It will be observed that the defendant Landis, who is the complainant in the cross-bill, admits all of the allegations set forth in the original bill of complaint. He sets up, by his cross-bill, his claim to an equitable right to share in the security of the mortgage which is being foreclosed. This equity he alleges he has because his loans and those of the association or Syndicate No. 3, made or to be made, formed the whole consideration of the bond which the mortgage was given to secure. That Mr. Landis did make the loans, and that he made them to the Sea Isle City Hotel Company, and that they amounted to the sums before named, and were made at dates mentioned, is not disputed. The sole question in dispute between the parties arises from the assertion on the part of Mr. Landis of his right to share in the security of this mortgage, and its denial on the part of Mr. Boney, the complainant in the original bill.

The burden is, therefore, upon Mr. Landis affirmatively to establish his right by the proofs. There is no evidence in writing which expresses any contract or agreement on the part even of the Sea Isle City Hotel Company, that Mr. Landis should share in the benefits of the security of this specific mortgage. The only writing which indicates in any way that Mr. Landis was to be secured at all consists of three receipts given to him at the time when he made the loan, which are in these words :

"Office of Sea Isle City Hotel Company,  
"116 North Third Street, Philadelphia, July 3, 1888.

"Received of Mr. Charles K. Landis, $1,536.87, being part of the amount for stock subscribed to the Sea Isle City Hotel Company, to be secured by mortgage upon same terms as Third Syndicate.

"S. W. Goodman,  
"*Secretary.*"

Boney *v.* Williams.

"OFFICE OF SEA ISLE CITY HOTEL COMPANY,
"402 LOCUST STREET, PHILADELPHIA, July 31, 1888.

"Received of Charles K. Landis, $1,505.41, being part of amount for stock subscription to the Sea Isle City Hotel Company, to be secured by mortgage upon same terms as Third Syndicate.

"$1,505.41.                                             S. W. GOODMAN,
                                                          "*Secretary.*"

"PHILADELPHIA, August 27, 1888.

"Received of Mr. Charles K. Landis, the sum of $1,410.30, being part of amount for stock subscribed to the Sea Isle City Company, to be secured by mortgage upon same terms as Third Syndicate.
                                            "S. W. GOODMAN,
                                                "*Secretary.*"

Interpreting these receipts by the words used, they indicate that the party receiving the money declares that the payments made were parts of the amount subscribed for stock of the Sea Isle City Hotel Company, and that the money paid was to be secured by mortgage upon the same terms as were given to the third syndicate. The phrase providing that the amount paid was to be secured upon "the same terms," does not state that Mr. Landis should, on his subscription for stock, have the same security as the Syndicate No. 3 had for money loaned. The payments would not in such case "be secured by mortgage on the same terms," because Mr. Landis would thereby have not only the stock for which he subscribed, but also the security of a mortgage for the repayment of his subscription, while the Syndicate No. 3 would have only the mortgage without the stock. Mr. Landis would thus be secured for his payments not on the same, but on much more favorable terms than the third syndicate. To secure them by mortgage upon the same terms, the declaration must be construed to mean that the terms to each should be the same—that is, that Mr. Landis and Syndicate No. 3, for their subscriptions to the stock of the hotel company, would be secured by mortgage to be given, which should equally secure both. No particular mortgage is indicated. The mortgage in foreclosure in this suit has been undisputedly shown to have been given, so far as Syndicate No. 3 is concerned, solely to secure moneys loaned, none of which were paid as subscrip-

tions to stock.   It is quite evident, therefore, if these receipts are to be deemed to mean what they say, and to point to the giving to Landis a mortgage securing his payments " upon the same terms " as the third syndicate, then this mortgage given solely to secure moneys loaned by the third syndicate and not subscribed for stock is not the one in which Mr. Landis was to share.   Mr. Landis, however, does not accept the receipts as expressing with precision the terms upon which he claims to share in the security of the complainant's mortgage.   He testifies that the agreement of loan gave him an assurance of security in the mortgage, and the relation which the payments had to the stock was not that of a subscription, but of an option to receive stock if he chose to exercise it, and that there was no specified time when he should exercise it.   An examination of the circumstances preceding the giving and acceptance of these receipts will, I think, throw some light upon their intended meaning.

The Sea Isle City Hotel Company was a corporation of the State of New Jersey.   In the spring and summer of 1888 it was engaged in the construction of its hotel at Sea Isle City. The hotel company was short of funds.   Mr. Landis, before any of the loans were made by him, was a subscriber for shares of the stock of the hotel company.   In May, 1888, as appears by the deposition of the secretary of the company, the secretary was instructed to communicate with Mr. Landis as to his promise to subscribe for two hundred additional shares of stock.   In the minutes the entry appeared in these words, under date of the meeting of May 7th, 1888 :

" The secretary was instructed to communicate with Mr. Landis as to the promise made by him to subscribe to two hundred additional shares of stock."

The secretary testifies that he acted in accordance with the instructions of the minute, and that it was some time after this that the loans were made on which the receipts were given to Mr. Landis.   The first loan was made by Mr. Landis on July 3d, 1888.   The memorandum in the minutes and the testimony of the secretary certainly justified the inference that in May,

1888, the hotel company understood that Mr. Landis had prom-
ised to subscribe for two hundred additional shares of its stock,
and that it had notified Mr. Landis of this understanding. Mr.
Landis, when examined in this case after this testimony was
before the court, gave neither denial of such a promise nor of
the notice from the secretary, though he testified as to both the
secretary's statements and the minutes upon other points.

I think I am bound to believe that, in May, 1888, Mr. Landis
knew that the hotel company understood that he had promised
to subscribe for two hundred additional shares of its stock.
Shortly after this notice, to carry into effect his promise to sub-
scribe, Mr. Landis, in July and August, 1888, paid these moneys
and accepted without protest these separate receipts, each of
which stated that he had made partial payments for stock sub-
scribed to the hotel company. Nothing on the face of these
receipts indicates an option and nothing is proven, except by the
testimony of Mr. Landis, as to any mention of an option, and
by him only in the most general terms, without statement of the
time when, place where, or person with whom he agreed for an
option.

The secretary, Mr. Goodman, swears that as he understood it
at the time the receipts were given, the words "being part of
amount for stock subscribed" &c. accurately stated the fact.
Mr. Landis has himself, so late as December, 1892, indicated
the same view of the contract on which he advanced these
moneys. In his letter to the hotel company of that date, he
states that he paid the money "under conditions *mentioned in
the receipts* for the same *as a subscription to certain stock*" of
the hotel company. He thus, four years after the event, joins
Mr. Goodman in asserting the accuracy of the definition of the
nature of the payments as stated in the receipts. These three
separate written memoranda made at the time the moneys were
paid, the statements of the witness who drew two and signed all
of them, and the letter of the man who paid the money and
without objection accepted all three of the receipts, all agree
that the receipts were given for part of the subscription to stock.
On the other side is indefinite and unsupported testimony given

nine years after the transactions happened, vitally changing the expressed declaration from a payment of subscription to an agreement for an option to subscribe. I think the weight of the testimony shows that the receipts, when taken, meant what they expressed, and that Mr. Landis paid these moneys as part of subscription for hotel stock, on the understanding that he was to be secured by mortgage upon the same terms as the third syndicate.

The counsel for the defendant, on the assumption that the evidence establishes the fact that the payments were loans with an option to subscribe for stock, cites the cases of *Totten* v. *Tisen, 54 Ga. 139*, and *Burt* v. *Rattle, 31 Ohio St. 116*, as authority that a corporation may borrow money and guarantee its payment with an option to the lender to become a stockholder. In both these cases the transactions passed upon depended upon the construction of statutes peculiar to those states, so that the decisions are of little value in the case under consideration. In each case, however, the court held that the transaction between the corporation and the other party was a loan and not a subscription to stock, while in the case in hand the proven payment was made on account of a subscription to stock, with a provision that the payment should be secured by mortgage.

There has been no showing of any authority in the hotel company to issue even preferred stock, with the statutory privileges allowed by our Corporation act, and, of course, no authority can be claimed for the proposition that a payment on account of the capital stock of a corporation can be secured by the mortgage of its property to the subscriber. By such a method all subscriptions to capital stock might be secured and the creditor of the corporation who can, under ordinary circumstances, look only to the capital stock, would be deprived of all remedy. No evidence has been submitted to show under what statute of New Jersey the hotel company was incorporated, but no statute justifies such an inequitable procedure.

It is clearly such a diversion of the capital of the corporation as is in derogation of the rights of the creditors of the corporation of which the third syndicate was one. See principles laid

down in *Wilkinson* v. *Bauerle, 14 Stew. Eq. 644.* This illegal course is, by the weight of the evidence, shown to have been taken, and the affirmative relief sought by the cross-bill should, on this ground, be refused.

If there were any doubt of the illegality of the transaction sought to be enforced, I cannot find that Mr. Landis has so carried the burden of proof of his case that his right to share in the complainant's mortgage has been established. He nowhere, even in his own testimony, shows that the hotel company agreed that he should share in this particular mortgage. That is left to be inferred from the fact that the receipts stated that his payments were to be secured by mortgage on the same terms as the third syndicate, and, as this mortgage was given to third syndicate, it is insisted that this security must be that intended. No action to bind the hotel company is shown, save by the receipts, and, as it is claimed, by conversations between Mr. Landis and "some of the stockholders of the hotel," who came to him and explained its financial embarrassments. "I was informed," he says,

"that there was a committee appointed of five, and that the other people would take just exactly the same as myself. I don't know how the committee was appointed, whether it was from the third syndicate or from the hotel company, but I told them I would be willing to advance enough to lay the floor and do the plumbing, as my share, with the understanding that the other parties would take care of the furnishings, and I would take a receipt which would explain the matter and secure me in the way of a loan. I was told that this committee consisted of George H. Becker, Michael J. Kelly, Mr. Boney, Mr. Class and Mr. Foederer, making some five people."

Mr. Landis further testifies that he had conversations with Mr. Boney touching the matter of the security to be given, but he was unable to name any time or place, when or where any such conversations occurred. He testifies he could not recall particularly what the conversations were, save that he had asked Mr. Boney what he thought the security would be, and Mr. Boney said it would be ample, and said it would be the same as the other. He did not designate them by name, but that was understood by Boney and himself. The witness was unable to

identify this conversation, or to relate it to any particular occasion. The nearest that I can find from the testimony of Mr. Landis that he. defines his claim, is his statement—

"When I loaned that money, Mr. Boney and every one of these men gave me a great deal of encouragement to loan it, and I was to be thoroughly well secured the same as the third syndicate."

On the other hand, Mr. Boney, in his testimony, denies that he had any such conversations with Mr. Landis, and denies that he ever had any information that Mr. Landis claimed to have any interest or right to participate in the security of the mortgage. No proof is offered of any corporate action by the board of directors or stockholders of the hotel company. The nearest is the reply of the secretary, made over eight years after the event happened, who, when asked by whom it was likely he was instructed to draw the receipts, answered, "No doubt by its president or members of the board." The evidence is too uncertain to establish as a fact that the hotel company itself ever arranged to secure Mr. Landis by allowing him to share in the security of the complainant's mortgage.

But if this is doubtful, there is an entire lack of proof that the third syndicate ever agreed to share their security with Mr. Landis. It was necessary, in order that he should have this benefit, that all three of the parties—Mr. Landis, the hotel company and the third syndicate—should agree. No one or two of them could bind the other. Mr. Landis and the hotel company could not contract that the third syndicate should allow Landis to share in the mortgage security, unless the syndicate joined in the contract, and this assent of the third syndicate must have been a part of the original agreement on which Landis parted with his money, for a consent by the third syndicate that Landis should share in the mortgage given after both had made their payments, would have been a mere naked promise to confer a benefit not capable of enforcement.

There is no evidence, even of Mr. Landis himself, which proves that the third syndicate agreed to allow him to have the benefit of their security, and thus subject itself to the risk that

the mortgaged premises might not be sufficient to pay its own
claim, and to the acceptance of a compulsory *pro rata* dividend,
with Mr. Landis, of the insufficient proceeds. The latter testi-
fies that he conversed with individuals and with a committee,
but he does not show that either had, or claimed to have, author-
ity from the third syndicate to agree that he should share in this
mortgage, nor, as I understand his testimony, does he declare
that the third syndicate ever did so agree. While on the stand,
under cross-examination, Mr. Landis was quite restive when it
was sought to induce him to define the times and places when
he had the conversations upon which he bases his claim, and at
one point his counsel interrupted to say :

"The witness don't state that he had any particular conversation with any-
body in particular which induced him to give the money which he did on the
receipts. There were operations conducted by a number of gentlemen, and
there were conversations with all of them."

This exposition of the testimony of this witness is a fair sum-
mary of the evidence which he gave. The obligation sought to
be imposed upon the holders of the complainant's mortgage is
not defined to have arisen upon any agreement entered into by
the owners of the mortgage, or by persons shown to have been
at the time authorized to act for those interested, but general
conversations on the general subject, held at various unnamed
times and places, with various persons, some of whom held, at
some undefined time, offices in the corporation interested, are
appealed to for the purpose of establishing a right to share in
this particular security. The conversations related, even if un-
explained, do not support so definite and violent a conclusion.
So the claim that the mortgage was made for the sum of $35,000,
which is in excess of the sum actually advanced by the third
syndicate, in order to secure Mr. Landis, is fully met by the
proof that it was expected, when the mortgage was drawn, that
the third syndicate would advance the whole amount, and the
cessation of its payments, when it had advanced $19,200, is also
explained by the fact that, at that stage of the payments, the
doubts as to the priority of the mortgage over the hostile claims

of lienholders alarmed the third syndicate and prevented the making of further advances. Mr. Gorman, who directed the drawing of the mortgage, and Mr. Kohn, who had been a member of the association, or Syndicate No. 3, almost from its origin, are explicit in their testimony that the mortgage was made to secure the third syndicate only, and that Mr. Landis' loans were not to be secured by it. Mr. Gorman explains that the mortgage was made to Messrs. Becker and O'Neil and not direct to the third syndicate, because of the embarrassments threatened by the claims of the lienholders which have since been settled. It was given on the demand of Syndicate No. 3.

The issue presented by the cross-bill is whether the consideration of the bond which this mortgage was given to secure, was, in part, Mr. Landis' advances. He does not set up any equity claiming a right to share in the mortgage, because he was induced to loan his money, in that expectation, with the knowledge of the parties interested in the mortgage. He asserts by his cross-bill that this mortgage was made to secure him and others, and that they now refuse him his rights. Mr. Landis, as above shown, has not only failed to sustain the issue made by his cross-bill, but he has not succeeded in presenting such a case as satisfies me that the association or third syndicate knew of the general assurances given to Mr. Landis, and with such knowledge permitted him to make the advancements, relying on the security promised by the hotel company's receipts, without warning him that he could not have it. Such knowledge, to establish an equity in favor of Mr. Landis, must have been brought home to the association before or at the time Mr. Landis acted, for if the latter, without knowledge of the association, relying on the assurance of the hotel company's officers, paid out his money, and these facts afterwards came to the knowledge of the association, they would, as above stated, create no equity in favor of Mr. Landis. The essence of such an equity is that the party to be charged knew of the reliance of the party wronged at or before the time when the payment was made or the position changed, and so then knowing gave no denial of the right to rely. It is in such a case that the trite maxim applies—"Having been

silent when they should have spoken, they may not now speak when they should be silent." The " when " and the " now " are the potent factors in the maxim.

But nowhere in the testimony is there any proof of such knowledge on the part of the third syndicate at the time Mr. Landis acted, and its standing by, permitting him without warning to act in reliance on sharing in the association's security. Some years after the mortgage had been made, an application was made by Mr. Gorman to the association (No. 3) that Mr. Landis be permitted to participate in the mortgage.

Mr. Kohn testifies—

"The answer of the association was that when we made the loan to the hotel company there was no such question asked, and why should we at a later date allow anyone else to participate in that mortgage which we received for due consideration ?"

He further says the mortgage was given on the demand of his association (No. 3), and that the association's attorney had it in his custody, and the association several times assigned it and used it as its own property.

Mr. Gorman, in his testimony, when asked, " When did you first know Mr. Landis' claim to be entitled to participate in that mortgage ?" answered, " It was some time after the preparation of the mortgage and its recording, my best recollection would be ; maybe it was a year or two afterward."

Mr. Gorman further states that the purpose of the bond and mortgage was " to secure $35,000 which the No. 3 had agreed to loan to the hotel company."

Mr. Boney states that, up to the time of the filing of the cross-bill in this suit, which was in 1896, he had no information that Mr. Landis claimed any interest in, or right to participate in, the mortgage. In view of the merely suggestive character of the evidence submitted by Mr. Landis, and explicit denials of any knowledge of his claim by the third syndicate by the testimony of those who acted for it, I must hold that he has not shown any equitable claim to share in the complainant's mortgage.

I will advise a decree that the complainant in the original bill is entitled to the relief prayed for, and that the cross-bill should be dismissed, with costs.